

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED
**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 24, 2025**

_____

United States Bankruptcy Judge

_____

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Bankr. Case No. 18−30264−sgj11 |
| ACIS CAPITAL MANAGEMENT LP, *et al.*, | § § § | |
| Reorganized Debtors. | § § | |
| ACIS CAPITAL MANAGEMENT LP, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Adv. Proc. No. 20-3059 |
| DAVID SIMEK, | § § § | |
| Defendant. | § | |

**<u>MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56 [DE #71 & 72]</u>[1]**

I.    **INTRODUCTION**

       The above-referenced post-confirmation adversary proceeding was filed on April 9, 2020, seeking to avoid and recover $317,457.75 of prepetition payments made to an individual named

---

[1] All references herein to "DE # [__]" refer to docket entries on the docket maintained by the Bankruptcy Clerk in the above-referenced adversary proceeding.

1

David Simek ("Simek" or "Defendant"), pursuant to Bankruptcy Code Sections 544,[2] 547, 548, and 550 (the "Avoidance Action").  The Avoidance Action was abated by agreement of the parties for a ***very long time*** (for more than two years—from February 5, 2021, to April 26, 2023).  The Avoidance Action finally came before this court on the merits, through two motions filed by the Defendant, in February 2025:  (a) a Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), with Brief in Support [DE ## 68 & 69] ("MJP"), and (b) a Motion for Summary Judgment Under Fed. R. Civ. P. 56, with Brief in Support [DE ## 71 & 72] ("MSJ").  The court held oral arguments on these motions on April 16, 2025.

In their original complaint, Plaintiffs Acis Capital Management, L.P. and Acis Capital Management GP, LLC (collectively, "Plaintiffs," "Acis," or the "Reorganized Debtors") sought to avoid ***21 transfers*** made by Acis to Simek during the roughly one year before the Acis bankruptcy petition date—which was January 30, 2018 ("Petition Date").  Who is Simek?  Simek is alleged to have been retained by Acis as a consultant, pursuant to a Consulting Agreement (the "Agreement"), executed on June 15, 2016, by Acis's then-President, James Dondero ("Dondero").  Acis argues that the Agreement was an overly generous deal that was vague and did not benefit Acis.  Acis further contends that it was either meant to benefit an old friend of Dondero's or maybe also meant to drain Acis of assets—at a time when Acis was in contentious litigation with Joshua Terry ("Terry"), who eventually obtained a multi-million-dollar arbitration award against Acis and forced Acis into bankruptcy.  Specifically, Acis has sought to avoid:  (a) four payments totaling $53.053.63 that Acis made to Simek, in the 90 days before the Petition Date (between November 1, 2017 and January 29, 2018) (the "Alleged Preference Payments"), pursuant to 11 U.S.C. § 547(b); and (b) 21 payments totaling $317,457.75 (four of these 21 payments were duplicative of

---

[2] Utilizing TEX. BUS. & COM. CODE §§ 24.005 and 24.006, commonly referred to as "TUFTA."

the Alleged Preference Payments) that Acis made to Simek from December of 2016 through December of 2017 (the "Alleged Fraudulent Transfer Payments"), pursuant to either 11 U.S.C. § 548 or pursuant to 11 U.S.C. § 544 and §§ 24.005 and 24.006 of TUFTA (in either case, under either an actual-intent-to-defraud theory or a constructive fraud theory).

Approximately four years after the Avoidance Action was commenced, Acis filed a Motion for Leave to File a First Amended Complaint, on March 19, 2024 [DE # 49] ("Rule 15 Motion") seeking to *"refine[] the Original Complaint's damage calculation"*—these were the odd and ambiguous words chosen by Plaintiff for wanting to, in fact, add 13 more payments, totaling another approximately $200,000, as additional Alleged Fraudulent Transfer Payments. The Rule 15 Motion also sought to plead, for the first time, that Simek was an "insider" under Section 101(31) of the Bankruptcy Code. The court denied the Rule 15 Motion, mostly because of the inexplicable delay in both the *filing* of the Rule 15 Motion (again, it was filed approximately *four years* after the Avoidance Action was filed), as well as another inexplicable delay in *setting* the Rule 15 Motion for a hearing (the Rule 15 Motion was finally set for a hearing approximately one year after the Rule 15 Motion was filed—and only after a nudging of Plaintiff by the Defendant and the court for Acis to do so). *See* DE ## 74-76, 83-84 & 90.

A hearing was held on Simek's MJP and MSJ on April 16, 2025. At the hearing, the Plaintiffs announced that they were withdrawing their claims as to the Alleged Preference Payments (Count 1). Therefore, the issue before the court was whether it should grant judgment in Simek's favor on the Alleged Fraudulent Transfer Payments (Counts 2-4) without the need for a trial. The court has concluded that the Defendant, Simek, is entitled to summary judgment

3

without a trial. The MSJ is granted for the reasons set forth below.[3] Because the court is granting the MSJ, the MJP is moot.

II. **JURISDICTION**

Bankruptcy subject-matter jurisdiction exists in this Avoidance Action pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (H), so this court has statutory authority to enter a final judgment. Moreover, the court has constitutional authority to enter a final judgment because the parties have consented to the same. Lastly, venue is proper in this court pursuant to 28 U.S.C. §§ 1408 and 1409.

III. **UNDISPUTED FACTS**

Acis was a registered investment adviser and a portfolio manager for certain structured investment products known as collateralized loan obligations ("CLOs"). Acis was part of a massive group of companies that were related to Dallas, Texas-based Highland Capital Management, L.P. ("Highland"). Dondero was president of both Acis and Highland for most of their existence. Acis managed CLOs through portfolio management agreements ("PMAs") and sometimes managed other funds through investment management agreements. The source of Acis's revenue was fees payable to Acis pursuant to the PMAs (which were between Acis and the CLO issuers). Acis historically contracted out its operations to Highland pursuant to Shared Services Agreements and Sub-Advisory Agreements with Highland (pursuant to which Acis paid Highland fees).

Terry, mentioned earlier, was the primary person who managed Acis's CLOs until he was abruptly terminated by Dondero/Highland on June 9, 2016. Terry was technically an employee of Highland. He was also a 25% owner of Acis. Litigation and arbitration ensued soon after Terry's

---

[3] This Memorandum and Opinion constitutes the court's reasons for granting the MSJ, as required by Fed. R. Civ. Proc. 56(a).

4

termination. Terry eventually obtained a $7,949.749 arbitration award against Acis on October 20, 2017. A judgment confirming that arbitration award was entered by a state district court on December 18, 2017. Soon thereafter, Terry commenced an involuntary bankruptcy petition against Acis (on January 30, 2018). This court entered an order for relief, allowing the Acis bankruptcy case to go forward, on April 13, 2018, after a lengthy trial. The court determined that Highland and certain actors for it began efforts to denude Acis of its assets/value almost immediately after Terry obtained his arbitration award (by engaging in complex, value-depriving transactions on October 24, 2017, October 27, 2017, November 2, 2017, and December 19, 2017). At least one questionable transaction happened well before the arbitration award, on October 7, 2016. As part of the trial on the involuntary petition, the court determined that Acis met its burden of proving that Acis was generally not paying its debts as they became due, as of the Petition Date, as required under Bankruptcy Code Section 303(h)(1). Notably, the court never found Acis to be "balance sheet" insolvent in the trial on the involuntary bankruptcy petition. This is not necessary in the context of an involuntary bankruptcy filing, *id.*, but such a finding would also have been unlikely, since Acis was still party to five PMAs at the time, that were generating millions of dollars of annual revenue for Acis.[4] Terry had successfully managed to avert those PMAs from being stripped from Acis, through his swift filing of his involuntary petition against Acis soon after his arbitration award and judgment.

---

[4] Acis's assets included the five PMAs that were known by the following names: (1) Acis CLO 2013-1; (2) Acis CLO 2014-3; (3) Acis CLO 2014-4; (4) Acis CLO 2014-5; and (5) Acis CLO 2015-6 (collectively, the "PMAs"). Ex. 8 at ¶ 25 and n. 7 [Def. App. 818]; Ex. 1 at 122:13-17 [Def. App. 122]; 122:25-124:6; 124:15-21 [Def. App. 122-24]; 125:17-126:2 [Def. App. 125-26]; 127:12-17 [Def. App. 127]; 131:16-132:4 [Def. App. 131]; 132:7-11, 20-24 [Def. App.132]; 133:10-23 [Def. App. 133]; Ex. 2 at 7:5-16 [Def. App. 291]; Ex. 3 at ¶ 24 [Def. App. 674]; Ex. 7 at 6 [Def. App. 767]; Ex. 8 at ¶ 1 [Def. App 810], ¶25 and n.5 [Def. App. 818], ¶84 [Def. App. 837]. Acis had been managing the CLOs for about $10 million per year of fees." Ex. 3 at p. 17 [Def. App. 682]. All references to "Ex. [ ]" in "Def. App. [_]" in this Order refer to exhibits in Defendant's Appendix in Support of its MSJ at DE # 70.

Terry ultimately was awarded the equity of Acis in a hard-fought plan of reorganization that the court confirmed. He kept Acis's five PMAs intact and rejected all shared services agreements and sub-advisory agreement agreements between Acis and Highland related thereto. Thus, the business and ownership ties between Acis and Highland were severed. All other creditors of Acis, besides Terry, were paid in full—there weren't that many other creditors. The other creditors besides Terry were mostly law firms that had been representing Acis in connection with the arbitration against Terry. Their fees were fairly recently incurred (i.e., in the months leading up to the Petition Date). To be clear, most vendors that might have provided goods or services to Acis were actually vendors to Highland, and then Highland recaptured those costs from Acis through the shared services agreements and sub-advisory agreements.

Pursuant to the confirmed Acis plan of reorganization, the Reorganized Debtors (now with Terry at the helm) retained the right to pursue causes of actions and claims, including this Avoidance Action.

The Defendant, Simek, surfaced in the picture with regard to Acis on June 15, 2016, when he entered into a Consulting Agreement (the "Agreement") with Acis. ***By coincidence or not, this Agreement was executed just six days after Terry was terminated by Acis (on June 9, 2016).*** The Agreement contemplated that Simek would market Acis's future prospective CLOs to prospective investors—particularly institutional investors[5]--and oversee investor relations for existing investors.[6] Simek had 24 years of experience in finance and selling structured products.[7] The Agreement provided for Simek to be paid a consulting fee of $20,000.00 per month in advance for

---

[5] Ex. 15 Declaration of James Dondero at ¶ 3 [Def. App 1154]; Ex. 14 Simek 2023 Depo at 98:19-99:25 [Def. App. 1085]; 108:2-21; 109:18-110:7 [Def. App. 1087-88]; 84:14-85:3 [Def. App. 1081].
[6] Ex. 14 Simek 2023 Depo at 21:20-22 [Def. App. 1065]; 27:19-24 [Def. App. 1067]; Ex. 13 Simek 2020 Depo at 11:17-13:20 [Def. App. 1012].
[7] Ex. 13 Simek 2020 Depo at 25:2-29:4 [Def. App. 1015-1016]; *id.* at 99: 5-8 [Def. App. 1034] ("I probably, unfortunately, am the longest experienced person on Wall Street that has been doing CLOs and structured products for three decades, since the very first time they started.").

6

services provided, and another $5,000.00 per month for expenses, in addition to the cost of Simek's COBRA coverage for himself and his dependents. Simek lived in New York, but the Agreement provided he would need to be in Dallas some amount of time, where he rented an apartment.[8] The Agreement's term was stated to be June-December 2016. The unrefuted testimony in the summary judgment record is that, after the initial six-month term of the Agreement expired, Acis requested that Simek continue commuting to Dallas and performing the marketing services for Acis contemplated under the Agreement.[9] The unrefuted summary judgment evidence was that Simek continued to perform services for Acis under the terms of the Agreement (and was paid pursuant thereto) until the Petition Date."[10]

The theory of Acis's case is that Acis did not receive "reasonably equivalent value" in exchange for the payments to Simek (i.e., the $20,000 per month fees, plus $5,000 per month expenses, plus COBRA). Acis argues this was a "sweetheart deal" and "exceedingly generous." However, Acis presents no expert testimony suggesting that this was not within the range of reasonable market terms for a person in this industry with Simek's qualifications and experience.

Acis also argues that the Agreement is suspect since it was with *Acis*—since normally *Highland* hired personnel and passed the expenses of those personnel through to Acis, via shared services agreements and sub-advisory agreements. Acis adds that it is suspect that an early draft of the Agreement indicated Highland (not Acis) would be the counter-party, and then a second draft indicated "TBD" as the counter-party, and then Acis was ultimately the counter-party. But there is no summary judgment evidence to indicate that in June of 2016—just days after Terry was

---

[8] Ex. 14 Simek 2023 Depo at 6:11-16 [Def. App. 1062]; 17:7-18:18 [Def. App. 1064-65]; 36:6-20 [Def. App. 1069]; 42:6-43:11; 43:22-45:13 45:21-46:6 [Def. App. 1071-72]; 62:10-63:10; 63:20-64:9 [Def. App. 1076].
[9] Ex. 15 Dondero Declaration at ¶ 5 [Def. App. 1154-55]; Ex. 13 Simek 2020 Depo at 94:14-95:8 [Def. App. 1033]; 98:24-99:10 [Def. App. 1034]; 101:21-102:10 [Def. App. 1034-35].
[10] Ex. 15 Dondero Declaration at ¶ 5 [Def. App. 1154-55]; Original Complaint, DE # 1, at ¶¶ 28-30.

fired—this Agreement was intended to be anything other than an arrangement where someone new would be taking on *some* of Terry's former job duties. There is no summary judgment evidence that might hint at something surreptitious going on with the drafting.[11]

Acis also argues that Simek probably was not doing anything to earn his "sweetheart deal" since one witness deposed that had worked for Highland didn't know what Simek was doing. Specifically, a deponent named Damon Krytzer, who worked for Highland "[i]n or around 2017" (working from his home in San Francisco and going into Texas once a month), who testified that his role at Highland was "soliciting institutional investors," testified that Simek "was pretty irrelevant to what I was doing," adding that Simek "wasn't helping my team to get in front of new investors."[12] However, these selected quotes, frankly, don't seem to create a fact issue as to the reasonableness of Simek's Agreement and payments. In the same deposition. Mr. Krytzer also testified that he met with Simek "a bunch"—maybe a "couple dozen" times.[13]

Acis also finds it troubling that Dondero hand-wrote at the bottom of the Agreement: "As my Dad used to say: Better than You Deserve!??"[14] Acis adds that Dondero and Simek have apparently known each other for several decades and Simek worked for Dondero and Highland several years ago in the past.[15]

The additional theory of Acis's case is that, when the Alleged Fraudulent Transfer Payments were made, Acis was either insolvent or was rendered insolvent thereby, or was engaged in business or transactions for which any property remaining with Acis was an unreasonably small

---

[11] *See* Pls. App'x 1382-1400.
[12] Ex. 21, 5:20-6:9, Pls. App'x 1092; 19:15 – 20:17, Pls. App'x 1095.
[13] Pls. App'x 1093.
[14] Ex. 20 (attached as Ex. 1 to Original Complaint, DE # 1-1), Pls. App'x 1082, 1087.
[15] Ex. 19, Pls. App'x 1045-46, 57:10–58:21; Pls. App'x 1034, 13:23-14:1; Pls. App'x 1038, 27:1-6; Pls. App'x 1045, 57:10-19. All references to "Ex. [ ]" in "Pls. App. [ _]" in this Order refer to exhibits in Plaintiffs' Appendix in opposition to the MSJ at DE # 81.

capital, or intended to or would incur debts beyond the ability to pay as they matured, or the Alleged Fraudulent Transfer Payments were payments to an insider under an employment contract and not in the ordinary course of business.

Finally, Acis suggests that certain "badges of fraud" were present here such that an actual intent to defraud can be inferred—those badges being: insolvency, pending litigation (with Terry), payments to an insider (the alleged insider-status of Simek was not alleged in the original/live complaint). To be clear, the 21 payments to Simek occurred from **December 30, 2016 to December 29, 2017**. Terry obtained his Arbitration Award against Acis on **October 20, 2017**. Only five of the total 21 Alleged Fraudulent Transfer Payments occurred after that (and before the Petition Date), and they are in the same amount-range as the other prior payments to Simek.

## IV.   SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate whenever a movant establishes that the pleadings, affidavits, and other evidence available to the court show that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law.[16]  A genuine issue of material fact is present when the evidence is such that a reasonable fact finder could return a verdict for the non-movant.[17]  And material issues are those that could affect the outcome of the action.[18]  The court must view all evidence in the light most favorable to the non-moving party, and summary judgment is only appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[19]

## V.   DISCUSSION

---

[16] *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006).
[17] *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).
[18] *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002).
[19] *Piazza's Seafood World*, 448 F.3d at 752 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 32223 (1986)).

### A. Reasonably Equivalent Value.

Simek argues that Plaintiff has not shown the court any summary judgment evidence that creates a genuine issue of material fact on the element of "reasonably equivalent value." The court agrees. The Plaintiffs have had ample time to pursue discovery, and the only evidence suggested by that Plaintiffs relevant to "reasonably equivalent value" is that: (a) the Agreement seemed overly generous and was worded a bit vaguely, (b) Simek was someone Dondero had known for decades and once worked for him or Highland (thus, he might have been an "insider"—though "insiderness" was not pleaded in the original/live complaint), and (c) it seemed odd that Acis was the counter-party to the Agreement, and not Highland.

These conclusory statements are not summary judgment evidence that is sufficient to create a fact issue regarding reasonably equivalent value. There is summary judgment evidence that the Agreement with Simek was negotiated at arms-length,[20] for below market rates,[21] and that the services focused on promoting and marketing Acis to large institutional investors.[22] This is really not refuted by anything more than skepticism on the part of Acis. And, to the extent that the Alleged Fraudulent Transfer Payments were not *advance* payments, but were instead payments for antecedent debt, there is no summary judgment evidence provided (again, other than conclusory statements) that they were not for reasonably equivalent value. Satisfaction of an antecedent debt of Acis constitutes value in exchange for the transfer.[23] The court stresses that it is problematic that Acis does not have an expert on fair value and does not have any summary judgment evidence to prove that the monthly payments to Simek were outside a range of

---

[20] Ex. 15 at p. 1 ¶ 4 [Def. App. 1154].
[21] Ex. 14 at 59:21-60:5 [Def. App. 1075].
[22] *See* Ex. 15 at pp. 1-2, ¶¶ 3-5 [Def. App. 1154-55]; Ex. 14 Simek 2023 Depo at 21:20-22 [Def. App. 1065]; 27:19-24 [Def. App. 1067]; 98:19-99:25 [Def. App. 1085]; 108:2-21; 109:18-110:7 [Def. App. 1087-88]; 84:14-85:3 [Def. App. 1081]; Ex. 13 Simek 2020 Depo at 11:17-13:20 [Def. App. 1012].
[23] *In re Brentwood Lexford Partners, LLC,* 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003).

reasonableness for the kind of work Simek was retained to perform. There is no summary judgment evidence that raises a credible issue regarding whether Simek was actually doing the work contemplated for Acis. Simek received the compensation provided by the terms of the Agreement and beyond its stated termination date (December 2016)—when the parties apparently chose to continue on with the Agreement beyond its initial six-month term. There is no credible summary judgment evidence that this continuation of Simek's work and compensation was somehow a sham or a ruse.

### B. Insolvency and the Insolvency-Like Factors.

To prevail on a claim for constructive fraudulent transfer under Bankruptcy Code Section 548(a)(1)(B), Acis must ultimately demonstrate: (1) a transfer was made of Acis's property (or an obligation was incurred by Acis); (2) the transfer was made within two years of the petition date; (3) Acis received less than reasonably equivalent value in exchange for the transfer; and (4) Acis:

- was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
- was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
- intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
- made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.[24]

Similarly, under Section 24.006(a) of TUFTA, a transfer is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time or the debtor became insolvent because of the transfer.[25]

---

[24] 11 U.S.C. § 548(a)(1)(B); *In re Supplement Spot, LLC,* 409 B.R. 187, 199 (Bankr. S.D. Tex. 2009).
[25] *See* TEX. BUS. & COM. CODE § 24.006(a).

11

The Bankruptcy Code and TUFTA define insolvency as the financial condition in which "the sum of [an] entity's debts is greater than all of such entity's property".[26] The test for insolvency under both TUFTA and the Code is the balance sheet test.[27] However, under TUFTA, if the debtor "is generally not paying the debtor's debts as they become due," insolvency is presumed—i.e., a presumption arises that the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.[28] This presumption may be rebutted by proof that the debtor is not insolvent—i.e., showing that the sum of the debtor's debts is less than all of the debtor's assets at a fair valuation.[29]

The Fifth Circuit has instructed that the fair value of property is determined "... by 'estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions.'"[30] The assets may be valued if sold individually or if packaged in groups based on business considerations.[31]

Simek argues that Plaintiff has not presented any summary judgment evidence to create a genuine issue of material fact that Acis might have been insolvent, undercapitalized, or might have had assets that, if sold, were insufficient to pay all Acis's debts. Indeed, the unrefuted evidence was that, from 2016 through 2017 (when each of the Alleged Fraudulent Transfer Payments were

---

[26] 11 U.S.C. § 101(32)(A); TEX. BUS. & COM. CODE § 24.003(a)); *In re Ramba, Inc.,* 416 F.3d 394, 403 (5th Cir. 2005).
[27] *In re Northstar Offshore Group, LLC,* 616 B.R. 695, 737 (Bankr. S.D. Tex. 2020).
[28] *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 89 (Tex. 2015) (citing TEX. BUS. & COM. CODE §24.003(b)).
[29] *In re Ritz,* 567 B.R. 715, 747 (Bankr. S.D. Tex. 2017) (Further, there is a presumption of Chrysalis's insolvency because the evidence demonstrates convincingly that it was unable to pay its debts as they came due; and the Debtor certainly has not overcome this presumption based upon the record made at trial); *In re Pace,* 456 B.R. 253, 274 (Bankr. W.D. Tex. 2011) (Holding that the defendant "failed to rebut the presumption of Pace's insolvency at the time of the transfer under section 24.003(b) of the TUFTA.").
[30] *In re Brentwood Lexford Partners, LLC,* 292 B.R. at 268 (citing *Haddox,* 40 F.3d at 121 (quoting *Pembroke Dev. Corp.,* 124 B.R. at 402)).
[31] *In re Brentwood Lexford Partners,* LLC, 292 B.R. at 268.

made to Simek), Acis held assets including: the five PMAs (potentially worth $30 million);[32] an agreement known as the Universal/BVK Agreement (potentially worth many additional millions);[33] unliquidated claims against Highland (worth many millions). Highland did not begin engaging in transactions to offload Acis's assets/value until approximately mid-October 2017 (well after most of the Alleged Fraudulent Transfer Payments to Simek were made) and never managed to offload the five PMAs before Terry put Acis into an involuntary bankruptcy proceeding.

To determine whether a debtor's assets were unreasonably small, a court must "examine the ability of the debtor to generate enough cash from operations and sales of its assets to pay its debts and remain financially stable."[34] Under the Bankruptcy Code and TUFTA, the unreasonably small capital condition must be caused by and be a result of the transfers at issue.[35]

Here, again as demonstrated above, Acis has not refuted the summary judgment evidence suggesting that Acis, at all times when the Alleged Fraudulent Transfer Payments were made, had assets that would allow Acis to stay financially viable. It was only late October 2017, when Acis was hit with the Terry arbitration award, that Acis began aggressively engaging in transactions to offload its value. Sixteen of the 21 Alleged Fraudulent Transfer Payments were made before the arbitration award. And even as to the last five Alleged Fraudulent Transfer Payments, Acis still had its valuable PMAs intact. Finally, the fact that this court determined that Acis was generally not paying its debts as they became due as of the January 30, 2018 Petition Date (at the trial on the Acis involuntary petition) does not mean this court must find that Acis was generally not paying

---

[32] Ex.1 at p. 124, line 11-21 [Def. App. 124]; Ex. 2 at p. 7, lines 5-21 [Def. App. 291]; Ex. 12 (Exh. 9 therein) at p. 2 ¶ 9 [Def. App. 1008] (Terry's sworn Declaration on January 23, 2018).
[33] *E.g.,* Exs. 4-6 [Def. App. 723-765].
[34] *In re Houston Drywall, Inc.*, No. 05-95161-H4-7, 2008 WL 2754526, at *28 (Bankr. S.D. Tex. July 10, 2008) (citing *In re Pioneer Home Builders, Inc.,* 147 B.R. 889, 894 (Bankr.W.D.Tex.1992)).
[35] *In re Pioneer Home Builders, Inc.,* 147 B.R. at 894 (citing 11 U.S.C. § 548(a)(2)(B)(ii); TEX. BUS. & COM.CODE § 24.005(a)(2)(A)).

its debts as they became due *at the time of the Alleged Fraudulent Transfer Payments*. The world for Acis dramatically changed on October 20, 2017 when Terry obtained his arbitration award. Not only was this when most of Acis's debt was created (or at least liquidated), but it is also when Highland started offloading value from Acis. The summary judgment evidence simply does not create a fact issue of either balance sheet or equitable insolvency at the time that the Alleged Fraudulent Transfer Payments were made.

    C. *Actual Fraudulent Transfers Pursuant to Either Section 548(A) of the Bankruptcy Code or TUFTA 24.005.*

Section 24.005(a)(1) of TUFTA provides the statutory authority under Texas law to enable avoidance of an actual fraudulent transfer. The statute provides that an actual fraudulent transfer occurs when a transfer is made "with actual intent to hinder, delay, or defraud any creditor of the debtor."[36] Since direct evidence of actual intent is rarely available, courts typically rely on circumstantial evidence, known as "badges of fraud," to infer intent.[37] TUFTA provides a non-exclusive list of badges of fraud that may be considered to find actual intent on the part of a debtor. The badges of fraud listed in the statute include:

    (1) the transfer or obligation was to an insider;

    (2) the retained possession or control of the property transferred after the transfer;

    (3) the transfer or obligation was concealed;

    (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    (5) the transfer was of substantially all of the debtor's assets;

    (6) the debtor absconded;

---

[36] TEX. BUS. & COM. CODE § 24.005(a)(1).
[37] *In re Soza,* 542 F.3d 1060, 1067 (5th Cir. 2008).

(7) the debtor removed or concealed assets;

(8) the value of consideration received by the debtor was [less than] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[38]

Similarly, Section 548(a)(1)(A) of the Bankruptcy Code allows a trustee to avoid a transfer when a debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." Unlike TUFTA, the Bankruptcy Code does not set forth badges of fraud in the statute. However, the Fifth Circuit has identified similar badges of fraud that may serve as evidence that a transfer was made with actual intent to defraud:

> (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.[39]

---

[38] *Id.*
[39] *Id.*

Courts have rather uniformly held that, a finding of fraudulent intent cannot be inferred from the existence of just one badge of fraud.[40] "While a badge of fraud standing alone may amount to little more than a suspicious circumstance, [it is] insufficient in itself to constitute a fraud per se, several of them when considered together may afford a basis from which its existence is properly inferable."[41] While "[n]ot all, or even a majority, of the 'badges of fraud' must exist to find actual fraud,"[42] generally two or three badges of fraud is regarded as insufficient.[43] This court has previously held that three badges of fraud is insufficient to prove actual fraudulent intent.[44]

Acis has the "burden to offer evidence addressing the elements of fraudulent transfer as to each transfer."[45] Here, in Count 2 and 3, Acis alleges in conclusory fashion that Acis made the Allegedly Fraudulent Transfer Payments "with actual intent to hinder, delay, or defraud any entity to which [Acis was] or became, on or after the date that such transfer was made or such obligation was incurred, indebted."[46] However, Acis does not

---

[40] *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.),* 421 B.R. 251, 300 (Bankr. W.D. Tex. 2009).
[41] *United States v. Fernon*, 640 F.2d 609, 613 (5th Cir.1981) (internal citations omitted).
[42] *Soza*, 542 F.3d at 1067 (quoting *Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir. 1988)).
[43] *See, e.g., In re Texas E&P Operating, Inc.*, No. 17-34386-SGJ-7, 2022 WL 2719472, at *7–8 (Bankr. N.D. Tex. July 13, 2022); *In re 1701 Commerce, LLC*, 511 B.R. 812, 841 (Bankr. N.D. Tex. 2014) (finding three badges of fraud insufficient to infer actual intent, two of which were insolvency and pending litigation badges); *Ingalls*, 421 B.R. at 300 ("Proof of four to five badges of fraud has been found sufficient in several reported cases," but where at most one badge of fraud can be found, that is insufficient to prove actual intent.); *Byman v. Denson (In re Edwards),* 537 B.R. 797, 808 (Bankr. S.D. Tex. 2015) (three badges of fraud not sufficient to prove actual intent under TUFTA); *Taylor v. Trevino*, No. 3:20-CV-393-D, 2021 WL 347566, at *3 (N.D. Tex. Feb. 2, 2021) (fewer than four to five badges of fraud "may be insufficient to establish the existence of fraudulent intent").
[44] *In re Texas E&P Operating, Inc.*, No. 17-34386-SGJ-7, 2022 WL 2719472, at *12 ("The court concludes that the remaining three badges of fraud—insolvency, pending litigation, and reasonably equivalent value, if proven—are insufficient to establish actual fraudulent intent. Insolvency and pending litigation are two of the least probative badges of fraud, as they are present in the majority of bankruptcy cases.").
[45] *Walker v. Anderson*, 232 S.W.3d 899, 913 (Tex. App.—Dallas 2007, no pet.) *Tow v. Pajooh (In re CRCGP LLC)*, Adv. No. 07–3117, 2008 WL 4107490, at *3 (Bankr. S.D. Tex. Aug. 28, 2008); *see G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 843 (Tex. App.—Dallas 2006, no pet.).
[46] Original Complaint, DE # 1, at ¶¶ 51 and 59.

list any badges of fraud to support its conclusion that Acis made the transfers to Simek with actual intent to hinder, delay, or defraud Acis's creditors. Instead, Acis asserts "alternative" grounds, which simply mirror the elements for a constructive fraudulent transfer claim under Section 548(a)(1)(B) and, in part, Section 24.005(a)(2) of TUFTA.

Assuming the "alternative" allegations listed in Counts 2 and 3 are "badges of fraud" in support of an intentional fraudulent transfer claim, even then, Simek is entitled to summary judgment on Acis's claims. In Count 2, Acis pleads, at best, three "badges" of fraud: (a) Acis was insolvent as of the date of the Alleged Fraudulent Transfer Payments or became insolvent as a result of the transfers; (b) Acis was engaged, or about to engage, in business or a transaction for which any property remaining with Acis was an unreasonably small capital and (c) Acis intended to incur, or believed it would incur, debts beyond its ability to pay.[47] In Count 3, in addition to the same "badges" that it pleads in Count 2, Acis alleges the following: (a) the Alleged Fraudulent Transfer Payments were made after the State Court litigation between Acis and Terry was filed; and (b) Acis did not receive reasonably equivalent value in exchange for the Alleged Fraudulent Transfer Payments.[48] As a result, at most, Acis alleges five badges of fraud. However, as previously addressed, this court can find no summary judgment evidence to create a genuine issue of fact that Acis did not receive reasonably equivalent value in exchange for the Alleged Fraudulent Transfer Payments. And, as also previously noted, this court can find no summary judgment evidence that creates a genuine issue of fact with regard to the insolvency factors. All that is left is that the Alleged Fraudulent Transfer Payments began after the Acis/Terry litigation commenced—but even this is not all that significant when

---

[47] Original Complaint, DE # 1, at ¶¶ 51-54.
[48] Original Complaint, DE # 1, at ¶¶ 59-65.

one considers that the Agreement (and payments pursuant thereto) started before the litigation (and, indeed, right after Terry was terminated). Acis really has not put forth any summary judgment evidence to refute a reasonable inference that Simek was hired right after Terry was fired to handle some of his job duties.

### V. CONCLUSION

For the reasons set forth above, and based on the summary judgment evidence, the arguments, and authorities presented by the parties, the court grants the relief requested in the MSJ, and orders the dismissal of all Acis's claims pursuant to FED. R. CIV. P. 56. Simek is directed to submit a judgment consistent with this Memorandum Opinion and Order.

# # # # END OF MEMORANDUM OPINION AND ORDER # # # #